# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 8:11CR135 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | MEMORANDUM |
| ) | AND ORDER |
| SUSANA GUEVARA and ) | |
| KARINA MICHELLE GUEVARA, ) | |
| ) | |
| Defendants. ) | |

This matter is before the Court on the Findings and Recommendation (Filing No. 63)[1] issued by Magistrate Judge F.A. Gossett recommending that the Motions to Suppress (Filing Nos. 39, 40) filed by the Defendants, Karina Michelle Guevara ("Karina Guevara" or "Karina") and Susana Guevara ("Susana"), be denied. Both Defendants filed objections to the Findings and Recommendation and supporting briefs (Filing Nos. 70, 71, 72, 73) as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a).

## FACTUAL BACKGROUND

Judge Gossett's findings of fact are at pages 51-63 of Filing No. 66. Additional facts are supplied throughout this Memorandum and Order.

Both Defendants were charged in a one-count Indictment with possession with intent to distribute a mixture or substance containing 500 grams or more of a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1). The

---

[1]Judge Gossett's findings of fact and conclusions of law were made orally. The evidentiary hearing was held on two dates, and the transcripts appear at Filing Nos. 54 and 66. Judge Gossett's findings of fact and conclusions of law appear at pages 51-72 of Filing No. 66.

Defendants seek suppression of evidence and statements obtained as a result of their May 11, 2011, traffic stop.

At the evidentiary hearing, upon the request of Karina Guevara's counsel, William Pfeffer, Judge Gossett took judicial notice of Nebraska Revised Statute § 60-6,193. (Filing No. 54 ("Tr. 1"), at 45.) During closing argument the Special Assistant United States Attorney Martin Conboy IV stated that there were other statutes at issue, noting that in his brief opposing the Motion he cited to Nebraska Revised Statute 60-6,131(2).

Following the hearing, Judge Gossett concluded: Trooper Lewis of the Nebraska State Patrol had an objectively reasonable belief that Susana was impeding traffic, and that was the basis for the stop; Karina, as a passenger, had standing to contest the traffic stop and the duration of the stop, but lacked standing to contest the search of the Jeep; Susana had standing to contest the reason for the stop,[2] but she lacked standing to contest the search of the engine compartment;[3] once the manifold cover was removed, the troopers had reasonable suspicion to detain the Defendants; and, because Judge Gossett found no constitutional violations with respect to the stop, detention, and search, the Defendants' statements were not the fruit of any Fourth Amendment violations. Judge Gossett therefore recommended that the Motions to Suppress be denied.

---

[2] This Court also concludes that Susana had standing to contest the duration of the stop.

[3] Judge Gossett noted that if he was wrong about Susana having such standing, in the alternative, he found that she consented to the search of the engine compartment and her consent was not limited or withdrawn.

**STANDARD OF REVIEW**

Under 28 U.S.C. § 636(b)(1)(C), the Court must make a de novo determination of those portions of the Findings and Recommendation to which the Defendant has objected. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendations. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

**DISCUSSION**

Both Defendants object to the following conclusions made by Judge Gossett: 1) Trooper Lewis had an objectively reasonable belief that the vehicle driven by Susana was impeding traffic, justifying the stop; 2) both Defendants lacked standing to challenge the search of the engine compartment; 3) the women were not under arrest even after being held in a cruiser, handcuffed, and moved to another location where the vehicle was searched more thoroughly;[4] and 4) their statements were not fruits of prior constitutional violations.

**I.    The Stop; Objectively Reasonable Belief**

When asked why he stopped the vehicle, a Jeep Cherokee, Trooper Lewis testified: "It was traveling under the posted speed limit. It was in the passing lane, and there were approximately five to six vehicles behind it, also in the left-hand passing lane attempting to pass a slower moving semi." (Tr. 1, at 6.) Trooper Lewis explained further, stating that for approximately five miles the Jeep was traveling at a speed of 65 to 70 miles per hour[5]

---

[4]Susana referred to this conclusion as "implicit," as no specific conclusion was made with respect to this issue.

[5]The posted speed limit was 75 miles per hour.

in the passing lane alongside a semi truck, thereby not allowing the five or six vehicles behind the Jeep to pass the truck. Once the Jeep passed the truck, Trooper Lewis observed for another five miles that it remained in the passing lane so the vehicles that were behind the Jeep had to pass the Jeep on its right side. (Tr. 1, at 7-8.) Trooper Lewis stated that at one point he signaled Susana to move into the right lane so that he could pass the Jeep, but he was unable to get Susana's attention. Trooper Lewis issued Susana a warning for impeding the flow of traffic. (Tr. 1, at 36.)

The parties debated in their briefs and at the hearing which subsections of § 60-6,193 might be relevant. The Court finds that the only relevant subsection of § 60-6,193 is the following:

> (6) On any freeway, or other highway providing for two or more lanes of travel in one direction, vehicles shall not intentionally impede the normal flow of traffic by traveling side by side *and at the same speed* while in adjacent lanes. This subsection shall not be construed to prevent vehicles from traveling side by side in adjacent lanes because of congested traffic conditions.

Neb. Rev. Stat. § 60-6,193(6) (2012) (emphasis added).

However, the Court also finds the following statute relevant:

> (1) Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway except as follows:
>
> > (a) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement;
>
> . . . .
>
> (2) Upon all roadways, any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or

4

when preparing for a left turn at an intersection or into a private road or driveway.

Neb. Rev. Stat. §§ 60-6,131(1)(a) & (2) (2012).

Both Defendants argue that § 60-6,193(6) is inapplicable because: the statute requires an intent to impede traffic, and no intent has been shown; and the Jeep was not going at the same speed as the truck.[6] The Court need not reach these arguments, however, in light of the discussion below regarding § 60-6,131(1)(a) & (2).

As the Eighth Circuit has stated:

> Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred. It is well-established that "*any* traffic violation, regardless of the perceived severity, provides an officer with probable cause to stop the driver." Nonetheless, the police must "objectively ha[ve] a reasonable basis for believing that the driver has breached a traffic law."

*United States v. Washington,* 455 F.3d 824, 826 (8th Cir. 2006) (citations omitted).

Law enforcement officers are not expected to "interpret the traffic laws with the subtlety and expertise of a criminal defense attorney," *United States v. Martin,* 411 F.3d 998, 1001 (8th Cir. 2005) (quoting *United States v. Sanders,* 196 F.3d 910, 913 (8th Cir.1999)). The determination of objective reasonableness "is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *United States v. Smart,* 393 F.3d 767, 770 (8th Cir.2005). If an officer makes a mistake in law or fact, the mistake "must be *objectively* reasonable to avoid running afoul of the Fourth Amendment." *Martin,* 411 F.3d at 1001.

---

[6]Trooper Lewis testified that the Jeep was not traveling at the same speed as the truck and was going faster than the truck in order to pass it. (Tr. 1, at 65.)

All that was required in this case was a reasonable suspicion that *some* traffic violation occurred. The Court concludes that the relevant sections are: §§ 60-6,131(1)(a) & (2); and § 60-1,193(6). Trooper Lewis did not testify to a specific statute as the basis for the traffic stop, and he is not required to do so. He testified on direct and cross examination essentially that for ten miles the Jeep impeded the traffic flow by traveling at a speed close enough to the speed of the truck that the five or six vehicles behind the Jeep were not able to pass the truck and the Jeep. He also testified that, after about five miles when the Jeep finally passed the truck, it remained in the passing lane so that the five or six vehicles had to pass the Jeep on the right. Trooper Lewis stated he gave a warning for "impeding traffic." Although the statute specifically entitled "impeding traffic" is § 60-6,193(6), § 60-6,131(1)(a) & (2) also apply. Trooper Lewis's testimony that the Jeep was not traveling at the same speed as the truck, which is required for the application of § 60-6,193(6), cannot be squared with the rest of his testimony describing both the bottleneck caused by the Jeep with respect to the five or six vehicles behind it and Trooper Lewis's own ability to pass the Jeep. The Court interprets Trooper Lewis's testimony in its entirety as stating that the Jeep traveled at approximately the same speed as the truck, close enough to impede the flow of traffic. Therefore, the Court concludes that Trooper Lewis had an objectively reasonable belief that a traffic violation occurred, and a reasonable suspicion to stop the Jeep. He clearly described conduct prohibited by the "[d]riving on the right half of roadway required" statute, § 60-6,131, and the precise question as to whether the conduct was prohibited by the "impeding traffic" statute, § 60-6,193, need not be reached.

**II.     Standing**

**A.     Susana Guevara**

Susana has the burden to show an expectation of privacy in the Jeep. Relevant factors to this determination include: "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir. 1994).

The facts in this case appear similar to those in *United States v. Sanchez,* 943 F.2d 110 (8th Cir. 1991), in which the Eighth Circuit considered the following: Sanchez's possession of the car in question; he drove the car alone, without the owner, at a great distance from the owner; the evidence did not show that Sanchez had used the car on other occasions; he obtained the car from a friend whose last name was unknown to Sanchez; and, most important, Sanchez had no direct authority from the owner to use the car. *Id.* at 113-14. The Eighth Circuit determined that Sanchez lacked an expectation of privacy in the car and, therefore, he was unable to challenge its search and seizure.

In this case, when Trooper Lewis asked Susana about the Jeep's owner: "She didn't know the owner very well. She had spoken with a friend identified only as Javier. Javier was a friend of the owner of the vehicle identified as Santiago. Javier set up the two with the vehicle for the trip." (Tr. 1, at 12.) The evidence does not show that Susana used the Jeep on previous occasions. The evidence does show: the Jeep was registered in

7

California; the vehicle title had been signed over from Santiago, but the buyer portion of the title had not been completed; and Susana was driving the Jeep without the presence of the owner, but with Karina, who had no connection to the vehicle. Otherwise, the record shows no information about the vehicle. The Court concludes that Susana did not show a significant connection to the Jeep through a pattern of prior possession, specific knowledge with respect to the identity of Javier or Santiago, or any significant connection to the Jeep. She failed to meet her burden of showing a legitimate expectation of privacy in the Jeep, and therefore lacks standing to contest its search.

**B.     Karina Guevara**

Karina has the burden to show an expectation of privacy in the Jeep. *Gomez,* 16 F.3d at 256. As a mere passenger she lacks standing to contest the search of the vehicle. *Rakas v. Illinois,* 439 U.S. 128, 148-49 (1978); *United States v. Marquez,* 605 F.3d 604, 609 (8th Cir. 2010). Karina argues that she has an expectation of privacy in the Jeep because the vehicle was loaned to both her and her sister, they shared responsibility for the vehicle, and Karina drove the vehicle at times on their trip. Even assuming that those facts would establish an expectation of privacy in the Jeep, Karina has only argued those matters and has not offered any evidence to support her theory. Karina has not shown a legitimate expectation of privacy in the vehicle, and she lacks standing to contest the search of the Jeep.

III.     Consent

A.     Karina Guevara

Contrary to the government's argument and Judge Gossett's conclusion, Karina did not consent to a search of the Jeep. Trooper Lewis testified that Karina's consent was limited to her personal belongings. (Tr. 1, at 50.) Therefore, the discussion relating to the scope of consent is limited to Susana.

B.     Susana Guevara

Additional factual background regarding the search of the engine compartment is necessary for the discussion of the scope of Susana's consent to search the Jeep. Trooper Lewis testified that he and Trooper Pelster, who joined as backup, began the search of the engine area by opening the hood of the Jeep. (Tr. 1, at 24.) Trooper Pelster[7] immediately noticed that the engine area in the mid-90s vehicle was very clean, and in areas dust revealed fingerprints, hand prints, and smudges. (Tr. 2, at 11-12.) Trooper Pelster noticed some bolts around the intake manifold that were tooled, indicating they had been removed. (Tr. 1, at 24; Tr. 2, at 12-13.) Trooper Lewis then removed a bolt in order to remove the air cleaner assembly. As he removed the nut which had been under the bolt, the hose leading from a butterfly valve that was under the bolt to the air cleaner box fell off. This was significant because it indicated that it had been on and off, or removed recently, and not replaced properly. (Tr. 1, at 25-26; Tr. 2, at 14.) Trooper Pelster stated that the air breather, which is immediately on top of the intake manifold, came off very easily, meaning that it had been removed several times. (Tr. 2, at 14-15.) After removing

---

[7]Trooper Pelster trains law enforcement officers how to search vehicles. (Tr. 2, at 11.)

the air cleaner assembly, Trooper Lewis placed his fingers in the butterfly valve to manipulate it and try to see down into the motor. He placed a wrench through the butterfly valve and noticed that it would only go down one or two inches into the butterfly valve. He therefore knew that something, described as a plate, was blocking the area between the butterfly valve and the manifold, which defeated the purpose of the butterfly valve and did not allow air into the motor. The plate was not a factory product and was consistent for a compartment. (Tr. 1, at 27; Tr. 2, at 15.) The depth down to the plate was only two inches which further indicated a compartment, as the depth at that place should have been between six to eight inches. (Tr. 2, at 15.) Trooper Lewis then tapped on the hard object, shone his flashlight into the area and noticed that an area where he had tapped and scraped had been painted. Pieces of spray paint were on the wrench. (Tr. 1, at 24-29; 57-60.) Trooper Lewis inserted a drill into the butterfly valve, using more than one bit to drill a hole that he described as smaller than a dime. Shining a flashlight through that hole, Trooper Lewis could see cardboard and plastic. (Tr. 1, 77; Tr. 2, at 18.) At that point, Susana and Karina were detained, handcuffed, and moved to the mechanic's shop where the engine compartment was fully disassembled. (Tr. 1, at 78-79; Tr. 2, at 29.) During this process, the manifold was removed from the top of the motor, multiple bolts were removed from the manifold, and a metal box (an after market compartment) was found inside the manifold. Methamphetamine was found inside the box. (Tr. 1, at 85.)

1.  **Consent Generally**

As the driver of a borrowed vehicle, Susana had the ability to consent to a search of that vehicle. *United States v. Fuller,* 374 F.3d 617, 622 (8th Cir. 2004). In determining whether Susana voluntarily consented to the search of the Jeep, specifically the engine

compartment,[8] the Court must consider the following factors: age; general intelligence and education; whether Susana was under the influence; whether Susana had previously been informed of her *Miranda* rights (not required, however, for voluntary consent); any history of previous arrests; the length of time Susana was detained; whether threats, promises, or misrepresentations were made; whether Susana was in custody or under arrest at the time; whether the consent occurred in public; and whether Susana objected to the search. *United States v. Saenz,* 474 F.3d 1132, 1137 (8th Cir. 2007).

Viewing these factors in Susana's case, Trooper Lewis spoke with Susana in a conversational tone, and the evidence showed no threats, promises, or misrepresentations. Trooper Lewis was dressed in uniform and armed with a holstered weapon, but he did not draw attention to his weapon. Trooper Lewis testified that Susana appeared to be of average intelligence, in her early 20s, not under the influence of drugs or alcohol, without physical or mental limitations, and able to communicate without any problems in the English language. The conversation occurred in the cruiser and approximately twenty minutes after the stop. Once Susana consented, Trooper Lewis clarified with her that she was granting him consent, explaining to her that she had the ability to consent because she was in control of the Jeep. (Tr. 1, at 16-21.) She did not object during the search. Considering the totality of the circumstances and the relevant factors, the evidence shows that generally Susana knowingly and voluntarily consented to a search of the Jeep.

---

[8]Susana does not object generally to the conclusion that she voluntarily consented to the search of the Jeep. She specifically limits her argument to the search of the engine compartment.

11

**2.  Engine Compartment**

Susana argues that she never consented to a search of the Jeep's engine compartment, citing *Florida v. Jimeno,* 500 U.S. 248, 250 (1991).[9] The government argues that the scope of Susana's consent included the search of the engine compartment and the hidden compartment, and the drilling into the nonfactory sheet metal in the engine compartment was supported by probable cause.

The Eighth Circuit confronted the issue of whether a consent to search a vehicle included the engine compartment, considering the requirements described in *Jimeno*. *United States v. Gallardo,* 495 F.3d 982, 989-90 (8th Cir. 2007).  In *Gallardo,* the Eighth Circuit noted that it was clear that drugs would be the focus of the search as the officer had asked the vehicle's owner whether he had drugs in the truck and "'the typical reasonable person' would understand a suspect's general consent to search a vehicle for drugs to include consent to open unlocked containers within the vehicle, access apparently false compartments, and "search any part of the truck where [drugs] might be stored."  *Id.* at 990 (citations omitted).

In this case, before asking her consent to search the Jeep, Trooper Lewis asked Susana whether the Jeep contained any drugs or weapons.  (Tr. 1, at 15.)  During the search, Susana stated that it was not necessary to search her luggage.  (Tr. 1, at 74.)  The evidence does not show that Susana revoked her consent, or that she limited the scope of her consent, at any time before or during the search.  Therefore, the initial search of the

---

[9]In *Jimeno,* the Supreme Court considered whether a search of a vehicle extended to closed containers found inside the vehicle.  *Jimeno,* 500 U.S. at 250.

engine compartment up to the point where the officers knew of the hidden compartment,[10] was reasonable given the facts surrounding Susana's consent. *Gallardo,* 495 F.3d at 989-90 (owner of vehicle knew that drugs were the focus of the search, and his consent was not limited); *United States v. Siwek,* 453 F.3d 1079, (8th Cir. 2006) (it was objectively reasonable for an officer to insert a probe into the drain hole in a truck bed where the defendant gave voluntary consent to search the truck knowing that items, including drugs, were the subject of the search); *United States v. Alverez,* 235 F.3d 1086, 1089 (8th Cir. 2000) (cutting of a spare tire exceeded the scope of the consensual search); *United States v. Martel-Martines,* 988 F.2d 855, 857 (8th Cir. 1993) (the defendant's consent extended to officers' use of a hammer and screwdriver to punch a small hole in a sheetmetal top to a hidden compartment in the area of a truck bed).

Beyond the point when the troopers discovered that a nonfactory compartment was in the engine compartment, the Court concludes that probable cause supported the ensuing warrantless search of the engine area and the hidden compartment. By this time, the troopers' suspicions were aroused by their search of the engine compartment. Also, the following circumstances surrounding the stop and detention supported a finding of probable cause: the Defendants' accounts of their trip differed, and each stated their mother[11] lived in a different location; "third party" vehicles are indicators of possible criminal activity such as drug smuggling; a statute of Santa Muerte, known as the patron saint of

---

[10]This is an earlier point in the search than the point referred to by Judge Gossett in his conclusion. He chose the point at the mechanic shop when the manifold cover was removed.

[11]The two women are sisters.

drug smugglers, was in the passenger compartment of the Jeep; and Susana did not have an address for her aunt in Minneapolis, whom she said she was going to visit. All of these indicators support a finding of probable cause for the full search. *Alvarez,* 235 F.3d at 1089 (observations made during the consensual search gave officers probable cause to expand the search); *Martel-Martines,* 988 F.2d at 858 (even if the defendant's consent did not extend to the punching of a hole in the sheetmetal top of a hidden compartment in the truck bed area, officers had probable cause to support a warrantless search of the hidden compartment).

**IV.     Arrest**

Both Defendants argue that their detention ripened into an unreasonable arrest absent probable cause.

Once Trooper Lewis stopped the Defendants, he could request identification, vehicle registration, a driver's license, conduct computer searches relating to criminal history, make inquiries about the trip and its purpose, and detain the Defendants as long as "'reasonably'" necessary to conduct these activities and to issue a warning or citation. *United States v. Quintana,* 623 F.3d 1237, 1239 (8th Cir. 2010) (quoting *United States v. Jones,* 269 F.3d 919, 924-25 (8th Cir. 2001)). Factors such as conflicting stories given by a driver and a passenger may justify expanding the scope of the traffic stop and further detention of the vehicle's occupants.

In this case, the length of the detention was longer than in some cases but was not unreasonable under the circumstances. Several minutes were consumed with the traffic stop. Factors contributing to the reasonableness of the length of the detention included:

14

the Defendants' conflicting stories regarding their trip and where their mother lived; the vehicle was loaned to Susana by a man known to her only by his first name and originally owned by another man also known to her only by his first name; the buyer portion of the vehicle registration was left blank; a statute of Santa Muerte, known as the patron saint of drug smugglers, was in the passenger compartment of the Jeep; Susana did not have an address for her aunt in Minneapolis, whom she said she was going to visit; and the officers found a hidden compartment buried in the engine compartment that could only be extracted out of the engine compartment at a mechanic's shop. The length of the detention was reasonable under the circumstances.

**V.     Statements**

Because there were no Fourth Amendment violations, the Defendants' statements are not fruit of an illegal stop, detention, search or arrest. *Wong Sun v. United States,* 371 U.S. 471, 487-88 (1963).

Accordingly,

IT IS ORDERED:

1. The Magistrate Judge's Findings and Recommendation (Filing No. 63) are adopted, as modified with additional findings of fact and with respect to the following conclusions of law:

    a. Karina did not consent to a search of the Jeep;

    b. The point up to which the search was reasonable given Susana Guevara's consent, and at which probable cause supported the ensuing warrantless search, is when the troopers discovered that a nonfactory compartment was in the engine compartment;

15

2.  The objections to the Findings and Recommendation filed by the Defendant, Susana Guevara, (Filing No. 70) are overruled;

3.  The objections to the Findings and Recommendation filed by the Defendant, Karina Guevara, (Filing No. 72) are overruled; and

4.  The Defendants' Motions to Suppress (Filing Nos. 39, 40) are denied.

DATED this 21st day of February, 2012.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge